IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA A. SHEETZ, <u>et al.</u>, :
    **Plaintiffs** :
                                                              :     No. 4:15-cv-02210
       v. :
                                                               :     (Judge Kane)
**WAL-MART STORES, EAST, L.P.**, :
    **Defendant** :

## MEMORANDUM

Before the Court are cross motions to exclude proposed expert testimony. Plaintiffs Patricia A. Sheetz ("Mrs. Sheetz"), and her husband, Richard Sheetz (collectively referred to herein as "Plaintiffs"), have moved to exclude the report and testimony of defense medical expert Dr. Richard I. Katz. (Doc. No. 25.) Defendant Wal-Mart Stores, East, L.P., ("Defendant"), has filed a motion to exclude the report and testimony of Plaintiffs' retail liability expert, Fred B. Hurvitz. (Doc. No. 46.) An <u>in limine</u> hearing was held on these motions on October 23, 2017. The Court has taken under advisement the parties' submissions and the testimony offered at the October 23, 2017 hearing. Upon careful consideration of the arguments raised by the parties in their respective briefs, and the applicable law, for the reasons provided herein, the Court will deny Plaintiffs' motion <u>in limine</u> without prejudice, and grant in part Defendant's motion <u>in limine</u>.

## I.     LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Fed. R. Evid. 702. Rule 702 states, in relevant part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify

1

> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

As the United States Court of Appeals for the Third Circuit has explained, "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). The rules impose an obligation on district court judges to act as "gatekeepers" to ensure that an expert witness's testimony meets those three threshold requirements before consideration by a jury. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). In fulfilling its obligation as a gatekeeper, a court exercises discretion when deciding whether to admit or deny expert testimony. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146-47 (1997).

When considering the qualification requirement, a court must discern whether a purported expert has specialized knowledge in a given field. Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). In undertaking this inquiry, no particular background or credentials are necessary to establish the requisite specialized knowledge, as "a broad range of knowledge, skills, and training qualify an expert." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994); see Waldorf v. Shuta, 142 F.3d 601, 627 (3d Cir. 1998) (noting that a proposed expert witness' generalized knowledge or practical experience may be sufficient to qualify him as an expert). While the Third Circuit has instructed that a court must "eschew[ ] imposing overly vigorous requirements of expertise," the determination of whether an expert is qualified to testify about a particular topic is not one that has been reduced to a mere formality. Indeed, the court's assessment of a proposed expert's qualifications is predominantly a fact-specific endeavor that is

governed by the unique circumstances in each case. Voilas v. Gen. Motors Corp., 73 F. Supp. 2d 452, 456 (D.N.J. 1999) (quoting United States v. Velasquez, 64 F.3d 844, 849 (3d Cir. 1995)).

As for the reliability requirement, the United States Supreme Court has held that the gatekeeping function requires the trial court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S at 152. To meet this requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable . . . [but] the evidentiary requirement of reliability is lower than the merits standard of correctness." Pineda, 520 F.3d at 244. The expert's opinion "must be based on the methods and procedures rather than on 'subjective belief or unsupported speculation.'" In re TMI Litig., 193 F.3d 612, 664 (3d Cir. 1999) (citation omitted). "The focus is not upon the expert's conclusions, but rather upon his methodology; the issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions." In re Paoli R.R. Yard PCB Litig., 35 F.3d at 746. When evaluating the reliability of a witness's methodology, a court is guided by several familiar factors drawn from Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993):

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Paoli, 35 F.3d at 742 n. 8. These factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire, 526 U.S. at 150. Accordingly, the Rule 702 inquiry is a flexible one, and the court should also take into account any other relevant factors. Calhoun, 350 F.3d at 321.

The third and final requirement is fit, which means that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Schneider, 320 F.3d at 404. "Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Daubert, 509 U.S. at 591-92. Indeed, an expert who renders an opinion based on factual assumptions not present in the case or opines on a matter that does not relate to a dispute issue is not relevant and thus, will not assist the trier of fact, as required by Rule 702. Id. For example:

> The study of the phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

Id. Like the typical relevance inquiry, the standard for analyzing the fit of an expert's analysis to the case at hand is "not that high." United States v. Ford, 481 F.3d 215, 219-20 (3d Cir. 2007) (quoting Paoli, 35 F.3d at 745). However, expert testimony can be powerful and misleading because of the difficulty in evaluating it, and the Third Circuit has cautioned that "district courts should tread carefully when evaluating proffered expert testimony, paying special attention to the relevance prong of Daubert. Id. at 219 n.6.

## II.     DISCUSSION

### A.     Plaintiffs' Motion to Preclude Report and Testimony of Defendant's Proffered Medical Expert, Dr. Richard I. Katz

On April 28, 2017, Plaintiffs filed the instant motion in limine to preclude Defendant from offering the medical report and testimony of neurologist Dr. Richard I. Katz ("Dr. Katz"), at trial. (Doc. No. 25.)  Notably, the parties recently discovered that Dr. Katz died on August 23, 2017 while Plaintiffs' motion in limine was still being briefed. (Doc. No. 50 at 2.) Consequently, Defendant has retained Dr. Katz's medical partner, Dr. Richard H. Bennett ("Dr. Bennett"), to replace Dr. Katz at trial with concurrence from Plaintiffs.

The parties represent that this substitution does not render the currently pending motion in limine moot, and insist that the motion in limine presents arguments germane to the Court's assessment of the admissibility of Dr. Bennett's proffered expert testimony.[1]  (Doc. No. 50 at 2-3.)  Having undertaken a comparative review of the expert reports of Dr. Katz (Doc. No. 65-4), and Dr. Bennett (Doc. No. 65-3), however, the Court questions the appropriateness of rendering a ruling as to Plaintiffs' motion in limine to exclude the testimony and opinions of Dr. Katz at this pretrial stage.  The Court observes that Dr. Bennett's expert report is markedly different from that of Dr. Katz's in its discussion of the materials reviewed and relied on, its brief summation of Dr. Katz's findings, its recitation of Mrs. Sheetz's notable medical history, and its ultimate opinions and conclusions.  The Court's reservations regarding issuing a ruling on the substance of Dr. Katz's expert report and testimony is further buttressed by the fact that the

---

[1] However, the parties have not clarified for the Court what portions of Dr. Katz's evaluation and report will be adopted by Dr. Bennett at testified to at trial.

motion itself lodges a host of evidentiary challenges specific to Dr. Katz.[2] Indeed, in the Court's view, Plaintiffs have invited the Court to independently parse through their motion in limine, identify those objections arguably applicable to Dr. Bennett, resolve those objections in their favor, and exclude the expert report and testimony of Dr. Bennett in the abstract. This the Court declines to do.

In the absence of any particular challenge to the admissibility of the proffered report and expert testimony of Dr. Bennett, the Court cannot conclude at this juncture of the proceedings that the standards for admissibility set forth in Federal Rule of Evidence 702 have not been met. Thus, the Court will deny Plaintiffs' motion in limine without prejudice to the right of Plaintiffs to raise any specific objections to the testimony and evidence proffered by Dr. Bennett at trial. See Walden v. Georgia-Pacific Corp., 126 F.3d 506, 518 n. 10 (3d Cir. 1997) ("[M]otions in limine often present issues for which final decision is best reserved for a specific trial situation."); Botey v. Green, No. 3:12-CV-1520, 2017 WL 2535735, at *1 (M.D. Pa. June 8, 2017) ("While motions in limine may serve as a useful pretrial tool that enables a more in-depth briefing that would be available at trial, a court may defer ruling on such motions if the context of trial would provide clarity.") (citation and quotation marks omitted). However, in an effort to simplify its assessment of any evidentiary objections Plaintiffs may raise at trial on this issue, several cautionary and clarifying points bear emphasis.

---

[2] While the motion in limine is far from a model of clarity, by the Court's reading, it appears that Plaintiffs generally dispute: (1) the relevancy of those snippets from the expert report that detail Mrs. Sheetz's medical history, particularly the progression of her Parkinsonism, which includes references to previously reported incidents of falls leading up to her fall in the Wal-Mart shoe department on December 12, 2013; (2) Dr. Katz's reliance on what Plaintiffs have characterized as inadmissible hearsay and unfavorable witness deposition testimony concerning the cause of Mrs. Sheetz's purported fall in formulating his ultimate opinion that Mrs. Sheetz's fall in the Wal-Mart shoe department was precipitated by her Parkinsonism; and (3) Dr. Katz's qualifications in opining as to the precise cause of Mrs. Sheetz's fall.

Dr. Bennett is undisputedly qualified to offer testimony that falls within the scope of his expertise, training, and experience as a board certified neurologist, such as the symptomology and progression of Parkinsonism and the clinical manifestations of Parkinsonism on Mrs. Sheetz's mental and physical condition both before and after her fall. Indeed, it is beyond question that Dr. Bennett may opine on the effect Parkinsonism—and the medications used to treat Parkinsonism—could have had on Mrs. Sheetz's integrative motor functions, such as balance regulation, muscular rigidity, and gait, and on her non-motor systems. Moreover, it is beyond cavil that Dr. Bennett may, in formulating his opinions as to Mrs. Sheetz's physical and mental status at the time of her fall and in the ensuing years since her fall, tether his ultimate conclusions to facts or data that would be reasonably relied on by experts in his particular field, regardless of the admissibility of the facts or data relied upon. See Fed. R. Civ. P. 703.

However, the Court seriously questions whether Dr. Bennett may opine as to the precise cause of Mrs. Sheetz's fall. Indeed, conspicuously absent from the expert report is any explanation of how Dr. Bennett's expertise as a neurologist enables him to rule out the placement of the shoe bench as a potential cause of Mrs. Sheetz's fall and arrive at the conclusion that the "fall appeared to be the result of her underlying Parkinson's disease." See United States v. Rice, 52 F.3d 843, 847 (10th Cir. 1995) ("Applying the appropriate tests, we conclude [the expert] was really not called upon to supply specialized knowledge but to speculate and hypothesize. Traditionally, hypothesis may be an appropriate subject for expert testimony when based upon conclusions from established evidentiary facts, but here [the expert's] testimony was to be based entirely on pure surmise."); Watkings v. Schriver, 52 F.3d 769, 771 (8th Cir. 1995) ("[Plaintiff] fails to adequately explain how [the expert's] experience as a neurologist enables him to testify

7

that the injury was more consistent with being thrown into a wall than with a stumble into the corner. [The expert] was not certified at trial as an expert in either accident reconstruction or forensic medicine. . . . Accordingly, the district court did not abuse its discretion in refusing to allow Dr. Knox to speculate and then opine as to the specific manner in which the blow was received."). Moreover, the Court observes that the report is devoid of sufficient factual foundation to support his causation opinion, which leads the Court to conclude that such proposed testimony, on its face, amounts to nothing more than mere speculation or conjecture about "what is not known (and might or might not be the case)." Leonard v. Stemtech Health Sciences, Inc., 981 F. Supp. 2d 273, 280 (D. Del. 2013). Accordingly, the Court will deny Plaintiffs' motion in limine (Doc. No. 25), without prejudice and will defer issuing any evidentiary ruling on the testimony and expert report of Dr. Bennett until trial.

**B.     Defendant's Motion in limine to Preclude Testimony of Plaintiffs' Proffered Liability Expert, Fred Hurvitz[3]**

Defendant moves to exclude the testimony of Plaintiffs' proffered retail liability expert, Fred B. Hurvitz ("Mr. Hurvitz"), on the basis that the proffered testimony fails to meet Daubert's qualification, reliability, and fit standards. (Doc. No. 46.)

1.     Qualifications

Defendant argues that Mr. Hurvitz lacks the proper knowledge, education, training, or experience to render an admissible expert opinion about the safety of Wal-Mart's shoe department, and particularly the "hazardous condition created by the [shoe] bench where [Mrs.] Sheetz fell." (Doc. No. 47 at 7.) While Defendant concedes that Mr. Hurvitz may qualify as an

---

[3] The admissibility of Mr. Hurvitz's expert testimony was the primary subject of the October 23, 2017 in limine hearing.

8

expert in marketing, it maintains that nothing from Mr. Hurvitz's "curriculum vitae would suggest that he has any expertise i[n] safety, engineering, biomechanics, or human factors," that would enable him to offer testimony as to the placement of the shoe bench in the shoe department. (Id. at 7.)

The Court agrees with Defendant, and finds that Mr. Hurvitz is not qualified to render an opinion as to the safety implications of the design and placement of the shoe bench near the endcap of the shoe aisle in the Wal-Mart store. According to his curriculum vitae, Mr. Hurvitz holds a bachelor's degree in Accounting and a master's degree in Business Administration with an emphasis in Marketing from the Pennsylvania State University ("Penn State"). Mr. Hurvitz is currently a professor of Marketing in the Smeal College of Business at Penn State, and has developed and taught courses in Retailing, Principles of Marketing, Sales Management, Services Marketing, Marketing Strategies, and Consumer Behavior, among others, to more than 50,000 students over the span of forty years. (Doc. No. 46-3 at 18.) In addition, Mr. Hurvitz testified at the in limine hearing that he is a faculty expert in retailing and serves as a liaison between Penn State and the retailing industry. Specifically, he was awarded one of two national professorships by Kohl's Department Stores for retail management in higher education, was selected to participate in the J.C. Penney Professor Internship Program, and was invited to attend both the Annual Shareholder Meeting and the University Conference hosted by Wal-Mart, Incorporated. Notably, the only mention made by Mr. Hurvitz regarding his experience in retail safety was in the context of testifying that the practice of retail encompasses not only merchandising placement, store design and layout, and marketing, but also safety as a component.

While Mr. Hurvitz unquestionably has an extensive retail marketing background as evidenced by his curriculum vitae and the testimony offered at the in limine hearing, the Court is hard pressed to discern how his decades of marketing experience in the retail industry give him a basis upon which to judge the safety implications of shoe bench design and placement, and whether the arrangement of the shoe benches in the shoe department created a dangerous and defective condition. See Shreve v. Scars, Roebuck & Co., 166 F. Supp. 2d 378, 391 (D. Md. 2001) ("The fact that a proposed witness is an expert in one area, does not ipso facto qualify him to testify as an expert in all related areas."). While Mr. Hurvitz acknowledged at the in limine hearing the potential safety concerns that are associated with certain retail visual merchandising display techniques, he claimed no professional retail experience in safety engineering, occupational safety, safety training, or compliance and risk management.

Mr. Hurvitz's concessions on cross-examination that: (1) he has never been qualified as a retail safety expert on premises safety and liability issues in any court, (2) does not have a background in engineering, biomechanics, or human factors, and (3) resorted to consulting with Penn State's risk management group on existing safety regulations applicable to customer tripping hazards similar to the one assertedly at issue in this case in preparing his report, only reinforce this Court's finding that Mr. Hurvitz is not qualified to give an expert opinion on retail safety matters, particularly those known hazards presented by low-level fixtures unrelated to merchandising in the retailing environment, such as the particular risk posed by the shoe bench over which Mrs. Sheetz purportedly fell. See Jonson v. Sears, Roebuck & Co., 196 Wash. App. 1015 (2016) (addressing the admissibility of an expert opinion by a human factors engineering consultant specializing in safety and risk management that discussed safety precautions

recognized by the safety and human factors profession and opined that an ottoman in the center of an aisle of a shoe department "violated a typical shoppers' mental model or 'schema' about the world"). Thus, the Court finds that Mr. Hurvitz is not qualified to offer an expert opinion on Wal-Mart's failure to abide by its safety protocols and procedures, or the "placement, design and lack of conspicuity of the bench where" Mrs. Sheetz fell. However, given his vast experience in retail marketing, Mr. Hurvitz will be permitted to testify on matters concerning <u>general</u> merchandising practices and strategies in the retail environment, including floor layout, shelving layout, and product displays, particularly the purpose and design of end-caps, as he has described in numbered paragraph 2 of his expert report.[4]

    2.    <u>Reliability</u>

Further, even assuming, <u>arguendo</u>, that Mr. Hurvitz is, in fact, qualified to render an expert opinion on retail safety and premises liability, the Court agrees with Defendant that his testimony is not reliable. Mr. Hurvitz identifies no principles or methodology he relied on in reaching his conclusions regarding the shoe bench and offers no indication of how his training and experience form a sufficient basis for these conclusions. See <u>Anderson</u> 2017 WL 2189508, at *5 (finding the expert's testimony unreliable where the expert conducted no interviews, took no measurements of anything related to the accident, performed no tests, and attempted no recreation of the conditions which caused the accident, and cited no actual rules or guidelines that established a standard against which an expert could assess the particular retail display and

---

[4] Specifically, in light of the testimony from eyewitness Alisha Hanley that Mrs. Sheetz tripped and fell while viewing the merchandise on the endcap, the Court finds that Mr. Hurvitz's expert testimony regarding the endcap would aid the jury in resolving a factual dispute as to what, if any, role the retail display played in contributing to a hazardous condition that resulted in Mrs. Sheetz's fall.

noting that there is "simply too great an analytical gap between the data and the opinion proffered to find [the expert's testimony] reliable").

Instead, Mr. Hurvitz relies on two state court cases to provide the factual foundation for his opinions. In his expert report, Mr. Hurvitz cites to <u>Lanier v. Wal-Mart Stores, Inc.</u>, 99 S.W. 3d 431 (Ky. 2003), a Supreme Court of Kentucky decision, to support his proposition that "Wal-Mart has experienced slip, trip and fall type accidents in some of their other store locations . . . [, which] should have caused Wal-Mart to exercise greater caution with regard to the arrangement of displays and figures and benches in high traffic areas of the store," Additionally, although not cited in his expert report, at the <u>in limine</u> hearing, Mr. Hurvitz discussed his reliance on the proposed testimony and findings of a human factors engineer retained as an expert in <u>Jonson v. Sears, Roebuck & Co.</u>, 196 Wash. App. 1015 (2016), in arriving at most of his conclusions as to the nature of the hazard posed by positioning the shoe-bench in the aisle near an endcap.

Mr. Hurvitz's citation to these state court cases, however, is problematic. First, the Court is not convinced that the cases proffered as the basis for Mr. Hurvitz's testimony provide the type of facts or data that experts in his field would reasonably rely on in formulating an opinion on the subject of shoe bench design and placement as required under Rule 703. Moreover, as it relates to Mr. Hurvitz's admitted reliance on the <u>Johnson</u> case, it appears that Mr. Hurvitz has, in large part, parroted the findings and opinions of the human factors engineer specializing in safety and risk management hired to provide testimony on typical human behavior relevant to a plaintiff's trip and fall over an ottoman existing in the center of an aisle in a Sears store in Washington. While an expert may "adopt[ ] or incorporate[ ] . . . ideas, information, and analysis of others with expertise in the same field, it does not lead to the conclusion that an

expert with a perhaps overlapping, yet admittedly different, area of expertise should be permitted to merely adopt and incorporate verbatim another's 'expert' opinion." Bouygues Telecom, S.A. v. Tekelec, 472 F. Supp. 2d 722, 729 (E.D.N.C. 2007) (citations omitted).

Accordingly, because Plaintiffs have failed to meet their burden of establishing the admissibility of Fred B. Hurvitz's testimony, the Court will grant Defendant's motion in limine to exclude the testimony and expert report of Mr. Hurvitz in part, and will preclude Plaintiffs' expert from testifying as to all opinions set forth in his expert report relating to Wal-Mart's safety guidelines, the design and position of the shoe bench, and the hazards attendant in placing the shoe bench near the endcap in the shoe department, but for the conclusion set forth in numbered paragraph 2 of the report. [5]

## III.   CONCLUSION

Based upon the foregoing, the Court will deny Plaintiffs' motion in limine to exclude the report and testimony of Dr. Richard I. Katz without prejudice and will defer issuing any evidentiary ruling on the testimony and expert report of Dr. Richard H. Bennett until trial. The Court will also grant in part Defendant's motion in limine to exclude the report and testimony of Fred B. Hurvitz (Doc. No. 46), and will preclude Mr. Hurvitz from offering all proffered testimony set forth in his expert report but for the findings set forth in paragraph 2 of the report. An appropriate Order follows.

---

[5] Because the Court finds that Plaintiffs have failed to meet their burden of establishing the admissibility of the expert's testimony with respect to the first two substantive restrictions imposed by Daubert—qualifications and reliability—by a preponderance of the evidence, the Court declines to address Defendant's arguments regarding fit. See Daubert, 509 U.S. at 593 n.10.